IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELLIE JEMISON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  20-0733 |
| Social Security | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                                    December 10, 2020

 Kellie Jemison ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) to

review the Commissioner's final decision denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons

that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not

supported by substantial evidence and remand for further proceedings pursuant to

sentence four of 42 U.S.C. § 405(g).

## I.   PROCEDURAL HISTORY

 Plaintiff applied for DIB and SSI on October 19, 2012, alleging disability

beginning on October 18, 2012.  Tr. at 104-05, 166-67, 168-71.[1]  The applications were

denied initially, id. at 110-19, and at Plaintiff's request, id. at 120-21, the ALJ held an

---

[1]Plaintiff subsequently amended the alleged disability period to consist of two periods of disability; a closed period from October 18, 2012, through October 1, 2015, and an open period beginning July 9, 2017.  Tr. at 544-48, 568.  Plaintiff concedes that she performed substantial gainful activity ("SGA") lasting more than six months during the interim (October 2015 through July 9, 2017).  Id. at 544-48; Doc. 14 at 2-3.  For purposes of DIB eligibility, Plaintiff's date last insured (DLI) is March 31, 2022.  Tr. at 524; see 20 C.F.R. § 404.101(a).

administrative hearing on June 18, 2014.  Id. at 31-77 (duplicated at 630-76).  On

September 16, 2014, the ALJ issued an unfavorable decision, finding that Plaintiff was

not disabled.  Id. at 16-26 (duplicated at 574-84).  The Appeals Council denied Plaintiff's

request for review on February 1, 2016, id. at 1-5 (duplicated at 589-93), and Plaintiff

commenced an action in this court.  See Civil Action Number 16-1296.  On September

18, 2017, this court remanded the matter for further proceedings.  Id. at 622; Jemison v.

Colvin, No. 16-1296, Order (Doc. 20) (E.D. Pa. Sept. 18, 2017) (Ditter, J.).[2]

On remand, the ALJ held a new hearing on September 19, 2019.  Tr. at 541-70.

On November 18, 2019, the ALJ issued a second unfavorable decision, finding that

Plaintiff was not disabled as to either period of alleged disability.  Id. at 524-34.  Plaintiff

did not file exceptions in the Appeals Council, nor did the Appeals Council initiate its

own review, and therefore the ALJ's November 18, 2019 decision is the final decision of

the Commissioner.  20 C.F.R. §§ 404.984(d), 416.1484(d).

Plaintiff commenced this action in federal court on February 7, 2020.  Docs. 1-3.

The matter is now fully briefed and ripe for review.  Docs. 14, 17 & 18.[3]

---

[2]Specifically, the court remanded for consideration as to whether Plaintiff's 2013
period of employment amounted to an unsuccessful work attempt, and reassessment of
the weight given to medical opinion evidence regarding Plaintiff's mental limitations.
Jemison v. Colvin, No. 16-1296, Report and Recommendation (Doc. 18), at 24-25 (E.D.
Pa. Jul. 31, 2017) (Hey, M.J., approved and adopted by Ditter, J.) ("2017 R&R"); tr. at
617-18.

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order, In RE: Direct Assignment of Social Security Appeal Cases
to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 6.

## II.   <u>LEGAL STANDARDS</u>

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.   Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.   If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.   If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.   If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.   If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

<u>See</u> <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014); <u>see also</u> 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. <u>See</u> <u>Poulos v. Comm'r of Soc. Sec.</u>, 474 F.3d 88, 92 (3d Cir. 2007).

This court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

Plaintiff was born on February 22, 1978, and thus was thirty-four years of age at the time of her alleged disability onset date (October 18, 2012), thirty-nine at the start of the second, open period of alleged disability (July 9, 2017), and forty-one at the time of the ALJ's decision under review (November 18, 2019).  Tr. at 166, 168, 191, 235.  She is five feet, eight inches tall, and weighs approximately 225 pounds.  Id. at 195 (226 pounds at time of application), 1618 (223 pounds on 08/30/19).  Plaintiff completed the twelfth grade and obtained specialized job training as a phlebotomist in 2005, and as a certified nursing assistant in 2007.  Id. at 196.  She lived in an apartment until March 2019 when she moved in with her parents, id. at 556, and she has one daughter and one son.  Id. at 225, 559.  She has past relevant work as a nurse assistant and teacher's aide.  Id. at 196, 533, 560-61.

### A.    ALJ's Findings and Plaintiff's Claim

In the November 18, 2019 decision under review, the ALJ found at step one that Plaintiff engaged in SGA from October 2015 until July 9, 2017. Tr. at 526-27.[4]  At step two, the ALJ found that Plaintiff suffers from severe impairments of degenerative disc disease ("DDD") of the cervical and lumbar spine, lumbosacral radiculitis, DDD of the left hip, Lyme disease, obesity, major depressive disorder ("MDD"), and anxiety disorder. Id. at 527.  The ALJ also identified non-severe impairments of hypertension, thyroid nodule, and gastroesophageal reflux disease ("GERD"). Id.[5]  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or equals the Listing of Impairments (the "Listings"). Id. at 528.  The ALJ then found that Plaintiff retains the RFC to perform light work, except that she can stand/walk up to four hours in an eight-hour workday; sit up to eight hours; push/pull up to twenty pounds occasionally and ten pounds frequently; occasionally perform postural maneuvers except no ladders; is limited to simple, routine, repetitive tasks; is able to make simple work-related decisions; can have only occasional interaction with co-workers and supervisors, and no interaction with the public; and requires a low-stress work

---

[4]The ALJ somewhat confusingly explained, "Earnings in 2013 through 2015 do not appear to rise to the level of [SGA]. . . . However, it does appear that [Plaintiff] worked above [SGA] from October 2015 until July 9, 2017; however, it is not necessary to determine whether that work activity constitutes disqualifying [SGA] because, even assuming that it was not [SGA], there exists a valid basis for denying [Plaintiff's] application." Tr. at 527.  Nevertheless, the ALJ stated that her remaining findings covered both periods in which Plaintiff did not engage in SGA, that is, the periods before October 2015 and after July 9, 2017. Id. ¶ 3.

[5]Plaintiff does not challenge the ALJ's severity determination. Tr. at 550.

environment with no production-pace work and few workplace changes, with any such changes introduced gradually. Id. at 530. The ALJ found that Plaintiff could not perform any past relevant work, id. at 533, and that considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Id. As a result, the ALJ concluded that Plaintiff was not disabled. Id. at 534.

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because the ALJ (1) did not explain her finding that Plaintiff does not meet or equal the Listings, (2) erroneously evaluated Plaintiff's RFC, (3) improperly weighed the medical opinion evidence, and (4) improperly rejected Plaintiff's testimony. Docs. 14 & 18. Defendant counters that the ALJ's opinion is supported by substantial evidence. Doc. 17.

### B.    Summary of the Medical Evidence[6]

Plaintiff initially alleged disability due to chronic pain from Lyme disease, depression, and leg, hip and back pain from an old injury. Tr. at 195. In addition to various diagnoses related to these complaints, the record also contains diagnoses of obesity, anxiety disorder, GERD, lumbar stenosis with neurogenic claudication, lumbar and cervical radiculopathy, osteonecrosis, and shoulder pain. See, e.g., id. at 271, 413, 1336, 1338, 1346, 1446.

---

[6]As previously noted, this matter involves a closed period from October 18, 2012, through October 1, 2015, and an open period beginning July 9, 2017. Portions of the medical summary related to the closed period were also summarized in my 2017 R&R.

On January 31, 2012, Plaintiff presented to her then-primary care physician, Alexander Klufas, M.D., with complaints of shoulder pain, which Plaintiff attributed to a 2003 motor vehicle accident.  Tr. at 343.  Dr. Klufas prescribed Naprosyn[7] and referred Plaintiff to an orthopedist.  Id.  On August 28, 2012, Plaintiff reported pain "all over" and in "every joint."  Id. at 344.  On September 25, 2012, Dr. Klufas diagnosed Plaintiff with Lyme disease and prescribed antibiotics.  Id. at 345.

On October 18, 2012, Plaintiff's alleged onset date, she met with orthopedist R. Bruce Lutz, M.D., complaining of pain in her left hip and left foot, tr. at 514, and Dr. Lutz suggested that she undergo an MRI.  Id. at 518.  The MRI of Plaintiff's lumbar spine conducted the following week indicated DDD and multiple disc protrusions.  Id. at 501-02.[8]  Dr. Lutz discussed pain management techniques with Plaintiff, including cortisone injections, and prescribed 800mg of ibuprofen as needed for pain.  Id. at 487.

On October 29, 2012, Plaintiff told Dr. Klufas that she had been terminated from her job after becoming ill with Lyme disease.  Id. at 347.  Dr. Klufas continued her prior prescription for Lexapro.[9]  Id.

---

[7]Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug used to treat pain or inflammation. See https://www.drugs.com/naprosyn.html (last visited Oct. 19, 2020).

[8]DDD refers to normal changes to spinal discs as a person ages and the discs break down or degenerate, causing various problems such as osteoarthritis (the breakdown of tissue that protects and cushions the joints), herniated discs (abnormal bulging or breaking open of a disc), and/or spinal stenosis (the narrowing of the spinal canal). See www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview (last visited Oct. 19, 2020).

[9]Lexapro (escitalopram) is an antidepressant used to treat anxiety and major depressive disorder in adults.  See https://www.drugs.com/lexapro.html (last visited Oct. 19, 2020).  Dr. Klufas first prescribed Lexapro for Plaintiff in March 2011, when her

On December 6, 2012, Plaintiff complained about moderate to severe pain in her left hip, and Dr. Lutz suggested that she undergo an electromyogram ("EMG") and an x-ray.  Tr. at 295.  The EMG performed on December 11, 2012, did not reveal any abnormalities.  Id. at 508.  When Dr. Lutz saw Plaintiff again on December 13, 2012, he discussed with her the possibility of a future hip replacement.  Id. at 293.

On January 7, 2013, Dr. Klufas completed a consultative examination, tr. at 275-88, concluding that Plaintiff had the capacity to lift and/or carry ten pounds frequently, and twenty-five pounds occasionally, could stand a total of four hours in an eight-hour day and sit for eight hours with a sit/stand option.  Id. at 279.  Dr. Klufas found that Plaintiff could occasionally perform postural activities such as bending, kneeling, stooping, crouching, balancing, and climbing.  Id. at 280.

On February 6, 2013, William M. Waid, Ph.D., conducted a mental consultative examination.  Tr. at 267-72.[10]  Dr. Waid diagnosed Plaintiff with major depression and anxiety disorder, and reported a Global Assessment of Functioning ("GAF") score of 54.[11]  Id. at 271.  The doctor found that Plaintiff had moderate limitations in

---

complaints of feeling tired both physically and mentally led to a diagnosis of "depression/anxiety."  Tr. at 338.

[10]As I noted in my 2017 R&R, the fifth page of Dr. Waid's report appears to be missing.  See tr. at 269-72 (pages 1 to 4), 267-68 (pages 6 to 7).

[11]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR") at 32.  A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning with peers or co-workers)."  Id.  The DSM 5, which replaced the DSM-IV-TR, eliminated reference to the GAF score.  However, the Commissioner continues to receive and consider GAF scores in medical evidence, see

understanding, remembering, and carrying out short and simple instructions, and in

making judgments on simple work-related decisions, and extreme limitations in

understanding, remembering, and carrying out detailed instructions.  Id. at 267.  He also

opined that Plaintiff's had marked limitations in her ability to interact appropriately with

the public, with supervisors, and with co-workers, and in her ability to respond

appropriately to work pressures and changes in a routine work setting.  Id.

On February 15, 2013, Richard Small, Ph.D., conducted a mental assessment as

part of the initial determination of Plaintiff's claim.  Tr. at 82-83.  The doctor reviewed

the medical evidence and concluded that Plaintiff suffered from mild restrictions of

activities of daily living, mild difficulties in maintaining social functioning, and moderate

difficulties in maintaining concentration, persistence, or pace, and that she had no

repeated episodes of decompensation.  Id. at 83.  Dr. Small noted that Plaintiff was able

to care for her home, personal needs, and children, and that she took only over-the-

counter medications which were "mostly effective" in controlling her symptoms.  Id. at

84.[12]  Dr. Small found that Plaintiff was moderately limited in her ability to maintain

attention and concentration for extended periods, but that her sustained

concentration/persistence was not significantly limited in any other way and she had no

---

Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score
with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444,
447 (E.D. Pa. 2016)).

[12]As I noted in my 2017 R&R, although the quoted portion is not explicitly
identified as Dr. Small's language, in context it appears to be attributable to him.  The
portions of the form relating to Plaintiff's physical limitations appear to be attributed to
"Disability Adjudicator/Examiner" Nathan Mackneer, SDM.  Tr. at 86, 90.

limitations in understanding and memory.  Id. at 86.  Plaintiff was moderately limited in

her ability to respond appropriately to changes in the work setting, and was "able to meet

the basic mental demands of simple, routine work on a sustained basis despite the

limitations resulting from the impairment." Id. at 87.[13]

On April 30, 2013, Plaintiff began seeing Earl R. Trievel, D.O., after visiting the

emergency room ("ER") with high blood pressure, migraines, and dizziness.  Tr. at 416.[14]

Dr. Trievel prescribed lisinopril[15] for Plaintiff's high blood pressure.  Id. at 414.  On May

8, 2013, when Plaintiff described having chills, heartburn, and pain, the doctor took

Plaintiff off lisinopril and prescribed Prevacid and amlodipine.[16]  Id.  Dr. Trievel

conducted a physical examination on October 1, 2013, at which time Plaintiff denied

suffering from any psychiatric issues such as depression, excessive stress, or memory

loss, and she appeared oriented to person, place, and time, exhibited no issue with her

speech or thought processes, had intact recent and remote memory, and neutral mood.  Id.

---

[13]Immediately above this finding, Dr. Small included descriptions of two different claimants, one of which appears to describe Plaintiff, while the other appears to describe an entirely different person.  Tr. at 87.  In the opinion presently under review, the ALJ noted this irrelevant information, stating that its inclusion "places some doubt on the accuracy of this opinion." Id. at 532.

[14]Records from Dr. Trievel for the period April 2013-June 2014 are duplicated in the record, see tr. at 397-416, 1013-33, as are certain other doctors' records from 2018. See, e.g., id. at 1336-45, 1569-78.  Citations will be to the records' first appearance.

[15]Lisinopril is an enzyme inhibitor used to treat high blood pressure.  See https://www.drugs.com/lisinopril.html (last visited Oct. 19, 2020).

[16]Prevacid (lansoprazole) is a proton pump inhibitor that treats and prevents stomach and intestinal ulcers. See https://www.drugs.com/prevacid.html (last visited Oct. 19, 2020).  Amlodipine is a calcium channel blocker used to treat high blood pressure. See https://www.drugs.com/amlodipine.html (last visited Oct. 19, 2020).

at 411, 413.  Plaintiff saw Dr. Trievel on May 30, 2014, for anxiety and left hip pain.  Id.

at 401.  Because Plaintiff had recently been fired from her job and faced eviction, Dr.

Trievel advised Plaintiff to call a crisis intervention hotline.  Id.  He once again

prescribed lisinopril and Prevacid.  Id. at 400.  On June 12, 2014, Plaintiff saw Dr.

Trievel for reported swelling in her lower extremities, and he prescribed gabapentin.[17]

Id. at 397, 399.  X-rays performed on June 16, 2014, revealed moderate degenerative

changes to Plaintiff's left hip, id. at 1266, and minimal degenerative changes to Plaintiff's

lumbosacral spine.  Id. at 1270.

Plaintiff continued to see Dr. Trievel for various problems and medication

management for the remainder of the closed period of alleged disability (ending in

October 2015) and through the interim period when Plaintiff performed SGA (October

2015-July 2017).  Tr. at 929-1313, 1488-1606.  For example, in November 2014, Plaintiff

complained to Dr. Trievel of moderate, shooting pain in her right leg, and reported

arthritis, weakness, and restricted motion.  Id. at 998-99.  A review of Plaintiff's x-ray

showed spinal stenosis.  Id.  On December 30, 2014, Plaintiff returned for a work

physical because she planned on changing jobs, and reported fatigue and pain in her

chest, joints, neck, and lower back.  Id. at 995.  Dr. Trievel referred Plaintiff to a

specialist for cervical/lumbar spine degenerative disc and joint disease.  Id. at 996.

---

[17]Gabapentin (marketed as Neurontin) is an anticonvulsant used to treat adults for
nerve pain.  See  https://www.drugs.com/gabapentin.html (last visited Oct. 19, 2020).
This office visit followed a June 10, 2014 ER visit for complaints of swollen feet,
tingling left arm, headache and poor appetite.  Tr. at 1274-99.

On April 22, 2015, Plaintiff complained to Dr. Trivel of ankle and leg pain with a "swelling, burning sensation," and was maintained on Lexapro and lisinopril.  Tr. at 981.  She returned on May 1, 2015, following a hospital visit for leg pain and swelling.  Id. at 978-80.  Plaintiff reported that persistent nerve pain in her legs had been getting worse, described as a "stinging sensation which turns into spasms."  Id. at 979.

On June 2, 2015, Plaintiff visited Robert A. Ruggiero, Jr., M.D., of the Pennsylvania Orthopedic Center ("POC"), on referral from Dr. Trievel for re-check of leg pain.  Tr. at 1158-59.  Plaintiff described her pain as a "burning sensation, discomfort and tightness," moderate to severe.  Id. at 1158.  Upon examination, Plaintiff exhibited normal posture, gait and stance, was "exquisitely tender" over the midline, paraspinals, bilateral sciatic notches, and bilateral sacroiliac joints, had intact motor strength, and reduced range of motion of the lumbar spine due to pain.  Id.  Straight-leg raising and crossed-leg raising were positive, and Patrick Test was negative.  Id.[18]  Dr. Ruggiero started Plaintiff on Neurontin and referred her to physical therapy.  Id. at 1159.  On June 24, 2015, Daniel J. Kane, M.D., performed an electrodiagnostic evaluation with intact

---

[18]In the straight-leg raise test, which is done to determine whether a patient with low back pain has an underlying herniated disc, the patient has his or her leg lifted, and the test is positive if pain is produced between 30 and 70 degrees.  Johnson v. Colvin, Civ. No. 09-2228, 2014 WL 7408699, at *5 n.17 (M.D. Pa. Dec. 30, 2014) (citation omitted).  In the crossed-leg test, which is done to determine the presence of a herniation, the patient lies supine, the unaffected leg is lifted with the knee straight, and the test is positive if pain is produced.  Dorland's Illustrated Medical Dictionary (32nd ed. 2012) ("DIMD"), at 1888.  In the Patrick Test, which is done to determine whether a patient has arthritis of the hip, the patient lies supine with the thigh and knee flexed, one leg is placed over the other, and the knee is depressed toward the patient's trunk, and the test is positive if pain is produced.  DIMD at 1896.

results.  Id. at 1154-56.  Five days later, a follow-up with Dr. Ruggiero yielded the same

findings as earlier in the month, except that her crossed-leg raising was negative.  Id. at

1159.

On September 18, 2015, Plaintiff returned to Dr. Trievel with complaints of

bilateral leg pain.  Tr. at 972.  Plaintiff also reported extreme low back pain and said that

she was always tired and felt "very depressed" and "extremely stressed."  Id. at 973.  The

doctor diagnosed Plaintiff with, among other things, depression and neuralgia/neuritis

unspecified, and continued Plaintiff's medications.  Id. at 974.

On April 14, 2016, Dr. Trievel noted Plaintiff's chief complaint as bilateral leg

pain, starting in the groin area.  Tr. at 963.  The doctor diagnosed Plaintiff with

intervertebral disc degeneration in the lumbar region.  Id. at 964.  On August 31, 2016,

Dr. Trievel noted that the alignment of Plaintiff's major joints and spine was

symmetrical, muscle strength was 5/5 in all major muscle groups, and special testing of

the joints for range of motion, nerve compression, and joint contracture was within

normal limits.  Id. at 959.  Dr. Trievel ordered x-rays and referred her to an orthopedist.

On August 22, 2016, x-rays of Plaintiff's feet were normal, and x-rays of her

lumbar spine revealed advanced degenerative changes and osteophyte formations in her

left hip.  Tr. at 1099, 1101, 1104.  On October 20, 2016, Dr. Ruggiero saw Plaintiff for

her complaints of moderate to severe hip pain aggravated by general physical activity and

movement.  Id. at 1092.  Upon examination, Plaintiff exhibited normal gait and posture,

with tenderness in the midline, paraspinals, and bilateral sacroiliac joints, intact motor

strength, and reduced range of motion of the lumbar spine due to pain.  Id. at 1093.
Plaintiff exhibited a positive Patrick Test and negative straight-leg raising.  Id.

Plaintiff visited POC physicians twenty-two times between April 25, 2017, and
January 23, 2019, mainly treating with Dr. Ruggiero.  Tr. at 1314-1414.[19]  At the first
visit, Plaintiff reported low back pain that radiated into her left buttock and was
aggravated by standing.  Id. at 1357.  Upon examination, Plaintiff exhibited antalgic gait,
5/5 strength, pain with lumbar flexion and extension, limited internal and external
rotation, and a positive Patrick Test.  Id.  Dr. Ruggiero diagnosed Plaintiff with lumbar
disc herniation with radiculopathy, and prescribed Medrol and Percocet.  Id. at 1358.[20]

Plaintiff continued to see Dr. Trievel during the open period of alleged disability
(beginning July 9, 2017).  On September 5, 2017, Plaintiff presented with complaints of
pain in her tailbone and lower back due to a fall three days earlier.  Tr. at 943.  X-rays
showed no acute bony abnormality of her pelvis and no compression deformity,
spondylosis or acute abnormality of her lumbar spine.  Id. at 1045, 1047.  During a
follow-up the next week, Dr. Trievel referred Plaintiff to a specialist for GERD and
continued Lexapro for her reported depression.  Id. at 940.  In October 2017, Dr. Trievel

---

[19]Some of the POC records are duplicated in Dr. Trievel's records.  See, e.g., tr. at
1042-43, 1073-74, 1139-40, 1158-59.

[20]Medrol (methylprednisolone) is a steroid that prevents the release of substances
in the body that cause inflammation.  See https://www.drugs.com/medrol.html (last
visited Oct. 19, 2020).  Percocet is a combination of oxycodone, an opioid pain
medication, and acetaminophen, a less potent pain reliever that increases the effects of
oxycodone.  See http://www.drugs.com/percocet.html (last visited Oct. 19, 2020).

discontinued lisonpril for management of Plaintiff's benign hypertension and started her on spironoclatone.[21] Id. at 936, 938.

On October 30, 2017, during a return visit to Dr. Ruggiero, Plaintiff exhibited positive straight-leg raising and crossed-leg raising. Tr. at 1354. Dr. Ruggiero administered trigger point injections, referred Plaintiff to physical therapy, and added Celestone to her medication regimen. Id.[22] On December 8, 2017, Plaintiff reported that the injections worked for about five weeks, but that her lower back and radiating pain gradually worsened, consisting of "moderate to severe sharp stabbing" pain that was aggravated by sitting, standing and walking. Id. at 1351. Plaintiff reported that Percocet relieved her back pain and that she did not attend physical therapy due to financial restraints. Id. Upon examination, Plaintiff continued to exhibit positive straight-leg raising results, as well as limited range of motion due to pain. Id. at 1352. Dr. Ruggiero administered additional trigger point injections, continued Plaintiff's pain medications, and again recommended physical therapy. Id. During these and subsequent visits, Dr. Ruggiero repeatedly diagnosed lumbar disc herniation with radiculopathy. Id. at 1356 (09/20/17), 1354 (10/30/17), 1352 (12/08/17), 1350 (01/29/18), 1348 (02/16/18), 1346 (03/05/18), 1336 (05/02/18), 1528 (08/15/18), 1518 (12/21/18).

---

[21]Spironoclatone is used to treat heart failure, high blood pressure, and fluid retention. See http://www.drugs.com/spironolactone.html (last visited Oct. 19, 2020).

[22]Celestone (betamethasone) is a steroid that prevents the release of substances in the body that cause inflammation. See https://www.drugs.com/celetone.html (last visited Oct. 19, 2020).

On December 21, 2017, x-ray imaging of Plaintiff's cervical spine revealed mild to moderate degenerative changes of the cervical spine, most pronounced at C5-C6 and C6-C7.  Tr. at 1599.  On January 10, 2018, Dr. Kane reported that repeat electrodiagnostic studies, together with Plaintiff's history and physical examination, "reveal[] no electrical evidence of a significant cervical radiculopathy, brachial plexopathy or peripheral neuropathy contributing to her symptoms." Tr. at 1595.  The doctor noted the presence of some cervical nerve root changes on Plaintiff's right, rated mild to moderate, as well as significant right-sided pain and pain when turning her head to the right, which appeared to be attributable to radiculitis.  Id.

On January 29, 2018, Plaintiff informed Dr. Ruggiero of low back pain that was "moderate to severe dull aching," aggravated by sitting, standing and walking, as well as pain, stiffness, tenderness, and limited range of motion in her neck, and hip pain.  Tr. at 1349.  Examination findings included limited range of motion of the cervical and lumbar spine due to pain, and positive straight-leg raising.  Id. at 1350.  Dr. Ruggiero diagnosed Plaintiff with both lumbar disc herniation with radiculopathy and cervical spondylosis with radiculopathy, administered injections, and continued Plaintiff's regimen of pain medication.  Id.  The same diagnoses and treatment occurred on March 5, 2018.  Id. at 1346-47.

Meanwhile, on February 8, 2018, Plaintiff started a course of physical therapy, with intermittent visits through September 30, 2018.  Tr. at 1439-87.  Plaintiff's primary diagnosis was "[o]ther spondylosis with radiculopathy, cervical region."  Id. at 1439.  Plaintiff rated her cervical and back pain as 4/10 at rest and 9/10 with activity,

exacerbated by lifting, reaching, and rotating her head.  Id.  An initial evaluation revealed guarded posture, with all cervical motions limited by pain, cervical compression test positive for increasing pain in upper trapezius and right upper extremity, moderate to severe bilateral tenderness in the upper and middle trapezius with moderate spasms, all trunk motions limited by lumbar pain, and positive straight-leg raising at forty degrees bilaterally.  Id. at 1440.

On March 5, 2018, following further examination and similar findings, Dr. Ruggiero added a diagnosis of lumbar stenosis with neurogenic claudication.  Tr. at 1346.[23]  This diagnosis continued over the course of several subsequent visits, each time following a physical examination of Plaintiff.  Id. at 1344 (03/19/18), 1341 (04/06/18), 1328 (07/09/18), 1325 (08/15/18).  Plaintiff's list of diagnoses during this period also included osteonecrosis in relation to her left hip.  Id. at 1336 (05/02/18), 1330 (06/04/18).[24]

On March 8, 2018, Plaintiff underwent an MRI of her cervical spine.  Tr. at 1405-06.[25]  The study revealed "right subarticular and right foraminal zone disc herniation at C5-C6, causing moderate to marked stenosis of the right neural foramen with effacement

---

[23]Neurogenic claudication is limpness or lameness accompanied by pain and paresthesias in the back, buttocks, and lower limbs, relieved by stooping or sitting, usually caused by lumbar spinal stenosis.  DIMD at 369, 1265.  Neurogenic claudication is also known as pseudoclaudication, id. at 1541, which is the term utilized in the Commissioner's Listings.

[24]Osteonecrosis refers to necrosis (cell death) caused by obstruction of blood supply.  DIMD at 1235, 1347.

[25]The MRI report is repeated in at least two places in the record.  Tr. at 1407-08, 1583-84.

of the existing right C6 nerve root," "a prominent diffuse disc bulge at C3-C4," and "mild acquired canal stenosis and cord compression" at both C5-C6 and C3-C4.  Id. at 1405.

On March 15, 2018, Plaintiff visited Brandywine Family Footcare for complaints of heel pain lasting three weeks.  Tr. at 1422.  Plaintiff underwent an injection into her right tarsal tunnel, and orthotics were discussed.  Id. at 1424, 1425.  During follow-up visits, Plaintiff reported ongoing bilateral heel pain, id. at 1430, and she declined further injections because they did not help.  Id. at 1432.

On April 16, 2018, Plaintiff treated with POC orthopedist Richard Balotti, M.D., for complaints of neck pain with "sharp and throbbing" radiating pain into her right trapezius, shoulder, upper arm, forearm, and hand.  Tr. at 1337.  Upon examination, Plaintiff's cervical spine appeared non-tender, with no pain on flexion, extension or rotation, and with a negative Spurling test.  Id. at 1338.[26]  Dr. Balotti diagnosed Plaintiff with cervical radiculopathy and obesity, and administered epidural injections.  Id.  At a follow-up on June 4, 2018, Plaintiff reported that the injections provided no improvement.  Id. at 1330.  Following an examination, Dr. Balotti repeated his diagnosis of cervical radiculopathy, administered injections, prescribed Percocet, and again referred Plaintiff to physical therapy.  Id. at 1331-32.

On April 25, 2018, Human Services, Inc., performed a mental health intake evaluation.  Tr. at 1611-15.  Plaintiff described herself as "[o]verwhelmed with finances, strained relationship with family, no income, bad health, no plan in life," id. at 1612, and

_____

[26]A positive Spurling test indicates cervical root compression.  See http://www.ncbi.nlm.nih.gov/books/NBK493152/ (last visited Nov. 18, 2020).

told the evaluator that she was "angry with everything and everyone." Id. at 1614.

Plaintiff reported recent suicidal ideation, with no attempts. Id. at 1611. The evaluator

diagnosed Plaintiff with major depressive disorder, recurrent, unspecified, and

intermittent explosive disorder. Id. at 1615.[27] Plaintiff had one session with a therapist,

on May 2, 2018, at which time she exhibited depression and anxiety, was tearful over not

having a job and over family issues, and seemed "very interested" in finding work for

twenty hours per week. Id. at 1609. Plaintiff did not return for further therapy. Id. at

1607.

On May 16, 2018, Plaintiff treated with POC physician Jonathan P. Garino, M.D.,

for complaints of gradually worsening left hip pain, moderate to severe, aggravated by

general physical activity and walking, and associated with limping, stiffness, weakness,

numbness, tingling, and decreased range of motion. Tr. at 1333. A musculoskeletal

examination of Plaintiff's lower extremities revealed abnormal pattern gait, tenderness

over the groin and greater trochanter area, and limited range of motion, with positive

Patrick Test and negative straight-leg raising. Id. at 1334. Dr. Garino diagnosed Plaintiff

with traumatic arthritis of the left hip, reviewed hip x-rays showing moderate to severe

joint space narrowing and osteophytes, discussed possible total hip replacement, and

continued Percocet. Id.

---

[27]"[T]he criteria for intermittent explosive disorder focus largely on . . . poorly controlled emotion, outbursts of anger that are disproportionate to the interpersonal or other provocation or other psychosocial stressors." Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013), at 461.

On July 2, 2018, Plaintiff presented at Brandywine Hospital ER with complaints of low back pain after bending over and continuing pain on her right side. <u>Tr.</u> at 1549. X-rays showed no acute pelvic abnormality, and slight leftward curvature but no discrete compression fracture or acute abnormality of her lumbar spine. <u>Id.</u> at 1546, 1547, 1552-53. The attending physician discharged her with Medrol and Percocet with instructions to alternate heat and ice and follow up with her doctor. <u>Id.</u> at 1553.

On July 31, 2018, Plaintiff presented at Brandywine Hospital ER for left ankle and foot stiffness and pain. <u>Tr.</u> at 1533. Physical examination showed "very minimal tenderness or swelling with full range of motion." <u>Id.</u> at 1536. The attending physician recommended rest, ice, compression, and elevation, ibuprofen for pain and swelling, and continued Percocet for pain. <u>Id.</u>

On September 20, 2018, Dr. Garino again diagnosed Plaintiff with left hip arthritis, provided additional education regarding a total hip replacement, and referred her to Dr. Balotti for left hip injection. <u>Tr.</u> at 1524.

On September 30, 2018, Plaintiff was discharged from physical therapy. <u>Tr.</u> at 1484-87. The discharge summary documents right shoulder flexion and abduction range of motion deficits due to increased right-sided cervical pain, discomfort with movements of the left ankle, and discomfort with all motions of her cervical and lumbar spine. <u>Id.</u> at 1485-86. The therapist assessed Plaintiff with between forty and sixty percent limitation in mobility. <u>Id.</u> at 1486.

Plaintiff continued to treat with various POC physicians in 2019. <u>Tr.</u> at 1514-15, 1617-28. Dr. Ruggiero continued to oversee Plaintiff's treatment for back and hip pain,

with ongoing diagnoses of lumbar herniation with radiculopathy and arthritis of the left hip, id. at 1514-15 (01/21/19), 1624-25 (04/22/19), 1622-23 (07/24/19), and Dr. Balotti continued to treat Plaintiff for neck pain and associated symptoms, with diagnoses of cervical spondylosis without myelopathy and cervical radiculopathy.  See id. at 1620-21 (08/09/19 – both diagnoses), 1618-19 (08/30/19 – cervical radiculopathy).  During this period, Plaintiff continued to report significant pain, continued to exhibit reduced range of motion due to pain, and continued to receive narcotic pain medication.  Dr. Balotti continued to administer injections to relieve Plaintiff's cervical radiculopathy, id. at 1619, 1621, and Plaintiff declined Dr. Ruggiero's suggestion of an injection to relieve her low back pain.  Id. at 1623.  Dr. Ruggiero discussed the use of a cane to assist with ambulation, id. at 1625, and the doctor continued to discuss a total hip replacement with Plaintiff at each visit.  As of July 24, 2019, the total hip replacement needed a dental clearance to proceed.  Id. at 1623.

### C.    Other Evidence

Plaintiff's first administrative hearing, held on June 18, 2014, occurred during her closed period of disability (October 18, 2012, through October 1, 2015).  Tr. at 31-77.  Plaintiff testified that she stopped working at Brandywine Hospital in 2012 when her diagnosis of Lyme disease left her incapable of physically performing the job's duties.  Id. at 45.  She had only been able to find jobs that pertain to her nursing qualifications, but she struggled to get hired due to her physical limitations.  Id. at 47-49.  She experienced pain in her shoulders, neck, head, hands, legs, and buttocks, her legs fell asleep due to poor circulation, and she walked on her tip-toes and tripped at times.  Id. at

49.  She was always tired and her pain and numbness affected her ability to do things such as dress herself and prepare meals.  Id. at 51-52.  She had become very antisocial and had difficulty getting along with people, and her depression caused her to lose friends because she did not trust others and preferred to avoid people.  Id. at 52-53.

At the September 12, 2018 hearing, Plaintiff testified that she worked two jobs during the interim period (October 1, 2015, through July 9, 2017), first as a teacher's aide for children with behavioral issues, and then at a warehouse job shipping phones for Verizon.  Tr. at 550-56.  Plaintiff stated that she experienced physical problems while doing this work, which caused her to call out of work "a lot."  Id. at 552-53.  While working as a teacher's aide, her hip started to "lock up," she had back issues from sitting too long, and she experienced "traumatic arthritis" which she described as "bone rubbing on bone."  Id. at 552.  She testified that the warehouse job made her condition worse, due to the walk from the parking lot, being on a concrete floor all day, and standing and lifting in proximity to a vertical belt that made her nervous all the time.  Id. at 555.  She attempted to alleviate her pain by wearing braces and supportive socks and shoes, but it made things worse.  Id.  During this time Plaintiff experienced more pain from her herniated disc and started to experience foot and upper shoulder pain.  Id. at 556.  She described the process of standing and straightening up as "embarrassing."  Id. at 557.

When asked to focus on her physical condition since leaving those jobs, Plaintiff testified that she has difficulty sitting for longer than ten or fifteen minutes due to "tension" in her tailbone and her hip "locking up," and that although she sometimes would rather stand because of this discomfort, standing causes pain in her feet, back, and

hip.  Id. at 556-57.  She described the pain as throbbing everywhere.  Id. at 557.  She uses

a cane for ambulation, but the cane causes her palms to hurt and walking "hurts every

step I take."  Id.  She planned to undergo hip replacement surgery five months before the

hearing, but that the surgery "got displaced," causing her anxiety to increase.  Id.

Plaintiff testified that she will sometimes "stretch out" or lie down to help with

pain, but that nothing really helps.  Tr. at 558.  She also takes medication but only at

home, explaining that "I can't function with it out in public," and she cannot take Xanax

and narcotic pain medication at the same time because they make her "loopy."  Id.

Plaintiff explained her lack of mental health treatment by saying that it "felt like a waste

of time."  Id.  When asked to describe specific things that were bothering her, she replied,

"I'm just tired."  Id. at 559.

The ALJ also obtained testimony from a vocational expert ("VE") at the

September 12, 2018 hearing.  Tr. at 559-66.  The VE testified that Plaintiff's past relevant

work as a teacher aide was light and semi-skilled, and her work as a nurse assistant was

medium, performed heavy, and semi-skilled.  Id. at 559-60.  The ALJ asked the VE to

consider a hypothetical individual of Plaintiff's age, education, and work experience who

can perform less than full range of light work, stand and walk for up to four hours and sit

for six hours in an eight-hour work day, lift twenty pounds occasionally and ten pounds

frequently, and push and pull occasionally, who cannot climb ladders but can

occasionally engage in other postural activities, requires a sit-stand option at will

provided she is not off-task more than ten percent of the work period, is capable of

understanding, remembering and performing detailed, uninvolved work that requires

minimal social interaction with the public in a stable environment, is capable of concentrating and persisting at detailed, uninvolved tasks for at least two-hour intervals with normal breaks, requires minimal interaction with the public and occasional interaction with co-workers, and is capable of adapting to occasional routine workplace changes.  Id. at 562-63.  The VE responded that the limitations precluded Plaintiff's past relevant work, but that other light work existed that such a person could perform, including assembly and inspector positions and office helper.  Id. at 563.  When asked whether the person could perform the jobs if she required a cane for ambulation, the VE indicated that the office helper job "may be problematic," but the other jobs would be unaffected.  Id. at 563-64.

The ALJ next limited the hypothetical person to sedentary work, capable of lifting up to ten pounds, standing and walking up to two hours and sitting up to six hours in an eight-hour workday, no pushing or pulling with the bilateral power extremities, occasional postural activities but no ladders, sit/stand option at will, a cane for ambulation, and the same mental limitations as in the first hypothetical.  Tr. at 564.  The VE identified sedentary jobs that such a person could perform, including assembly, inspector and sorter positions.  Id. at 565.  If the person had a substantial loss in the ability to complete a normal workday and workweek without interruption from psychologically and physically based symptoms, the VE testified that work would be precluded.  Id.

D.    **Consideration of Plaintiff's Claims**

As previously explained, Plaintiff seeks disability for two periods -- a closed period from October 18, 2012, through October 1, 2015, and an open period beginning July 9, 2017, separated by a period of SGA.  Tr. at 544-48, 568.  The prior remand of this matter concerned only a portion of the closed period of disability, as the ALJ conducted her first hearing on June 18, 2014, and rendered her initial unfavorable decision on September 16, 2014.  Id. at 31-77, 16-26.

Other than acknowledging that the case involves two periods of alleged disability separated by SGA, the final decision under review essentially treats the two periods together for purposes of analysis.  For example, the ALJ's list of severe impairments does not differentiate between the first and second alleged disability periods, see tr. at 527, even though several diagnoses appear only in medical records from the second period. The ALJ concentrates the bulk of her discussion on the medical record from the first, closed period, with only four references to exhibits belonging to the second period, even though records from the second period are considerable.  See id. at 822-1654.  That is problematic, as will be discussed in more detail below.  In addition, the ALJ presents a single RFC assessment, see id. at 528, even though the two periods are separated by twenty-one months of gainful employment during which Plaintiff's condition appears to have worsened.  This unitary approach is reflected in the ALJ's conclusion that Plaintiff "has not been under a disability . . . from October 18, 2012, through the date of this decision," without reference to the two distinct periods of alleged disability.  Id. at 534.

Despite the ALJ's unitary approach, the medical and other evidence indicates that the later period of alleged disability should be treated separately from the first. For example, Plaintiff does not argue that she returned to work in October 2015 because her physical and/or mental impairments improved during the closed period, nor do the records support such a finding. To the contrary, as the detailed medical summary demonstrates, there is little to no difference in Plaintiff's physical or mental condition in the first period of alleged disability as during the interim period when she performed SGA. Indeed, Plaintiff testified that her condition became worse as a result of the work she performed during the interim period, see tr. at 555, and she repeats that contention in her brief. Doc. 14 at 3 ("working was detrimental to her health . . . as the objective medical evidence clearly shows that her musculoskeletal impairments are significantly more serious now than they were during the first period of alleged disability").

Plaintiff's return to work after the end of the closed period is not dispositive of her eligibility for benefits during that period, but it is relevant and must be evaluated in the context of other evidence. See Lee v. Comm'r of Soc. Sec., 248 Fed. App'x 458, 461 (3d Cir. 2007) (claimant's return to work not dispositive of eligibility during closed period, but ability to work on sustained basis was relevant as to entitlement to benefits for closed period ending one month before claimant returned to work). In the absence of record evidence of improvement in Plaintiff's physical and mental condition to explain her ability to resume working in October 2015, Plaintiff's return to gainful employment for twenty-months with essentially the same medical profile evidences her ability to work during the first, closed period. Stated differently, Plaintiff's contention that her physical

and mental problems are worse in the second period than they were during the first period, and that her condition worsened as a direct consequence of her return to work in the interim, suggests that Plaintiff was not disabled during the initial closed period, and this conclusion is not contradicted by the medical record.

For these reasons, I conclude that the ALJ's decision denying benefits is supported by substantial evidence as to the first, closed period of alleged disability (October 18, 2012, through October 1, 2015), and I will proceed to consider Plaintiff's claims as they apply to the second, open period of alleged disability (beginning July 9, 2017).

        1.     <u>ALJ's Consideration of the Listings</u>

Plaintiff first argues at step three that the ALJ did not reasonably explain her finding that Plaintiff did not meet Listings 1.04 (disorders of the spine), 1.02 (major dysfunction of a joint), 12.04 (depressive, bipolar and related disorders), and/or 12.06 (anxiety and obsessive-compulsive disorders), and that the ALJ failed to assess whether her impairments, considered in combination, medically equal the Listings. Doc. 14 at 3-10; Doc. 18 at 1-4. Defendant counters that the ALJ's step three determination is supported by substantial evidence. Doc. 17 at 6-8.

As previously explained, at step three of the five-step sequential evaluation, an ALJ must determine whether an impairment meets or equals the criteria of an impairment in the Listings at 20 C.F.R. pt. 404, subpt. P., app. 1. The Listings are a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe that they would be found disabled regardless of their vocational background. <u>See</u> 20 C.F.R. §§ 404.1525(a), 416.925(a). Plaintiff bears the

burden of showing that she meets a listing, see Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987), and she must meet all of the specified medical criteria of the listing in question. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Here, the ALJ considered four Listings -- two physical and two mental.  I will first address the ALJ's findings as to whether Plaintiff met the criteria of each Listing, and then address the ALJ's finding that Plaintiff's impairments, in combination, do not medically equal the Listings.

a.     Physical Listings

The ALJ's consideration of the physical Listings may be addressed together. Listing 1.04, entitled "Disorders of the spine," applies to spinal disorders "resulting in compromise of a nerve root or the spinal cord," with:

> A.  Evidence of nerve root compression, characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine); or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by finding on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 1.04.  The ALJ's entire consideration of this Listing consisted of the following:

> [Plaintiff's] scoliosis and cervical spine impairments do not meet Listing 1.04A because [they are] not associated with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. The impairment also fails to meet Listing 1.04B, as they do not result in spinal arachnoiditis manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours.  Lastly, the impairment fails to meet Listing 1.04C, as they do not cause lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.

Tr. at 528.

Listing 1.02, entitled "dysfunction of a major weight-bearing joint due to any cause," concerns joint dysfunctions

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
> > A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
> > B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine or gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 1.02.  The ALJ evaluated Plaintiff's degenerative joint disease of the left hip under this Listing, and stated in full as follows:

> This listing requires a condition characterized by: gross anatomical deformity (e.g., subluxation, contracture, bony or

> fibrous ankylosis, instability); and chronic joint pain and
> stiffness with signs of limitation of motion or other abnormal
> motion of the affected joint(s); and findings of joint space
> narrowing, bony destruction, or ankylosis of the affected
> joint(s).  These conditions must result in an ability to
> ambulate effectively, as defined in 1.00B2b.  [Plaintiff's]
> degenerative joint disease of the left hip does not meet listing
> 1.02.

Tr. at 528.

The ALJ's consideration of the physical Listings is flawed for several reasons.

First and most obviously, the ALJ's consideration of these Listings is entirely conclusory,

merely quoting the requirements and stating that Plaintiff does not meet them, with no

citations to the record or discussion of Plaintiff's treatment history.  The Third Circuit

requires the ALJ to "set forth the reasons for [her] decision," Burnett v. Comm'r of Soc.

Sec., 220 F.3d 112, 119-20 (3d Cir. 2000), "to ensure that there is sufficient development

of the record and explanation of findings to permit meaningful review."  Jones v.

Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (citing Burnett, 220 F.3d at 120); see also

Karstein v. Comm'r of Soc. Sec., No. Civ. 17-4502, 2018 WL 5669172, at *6 (D.N.J.

Oct. 31, 2018) (remanding pursuant to Burnett, finding that "repeat[ing] the requirements

of the listing . . . and conclud[ing] that no medical evidence met the requirements,

without discussing Plaintiff's medical evidence" was insufficient analysis).  Several other

courts in our circuit have similarly remanded cases for further consideration where the

ALJ conducted no review or only a cursory review of the medical record in addressing a

Listing.  See DeJohn v. Comm'r of Soc. Sec., Civ. No. 18-15346, 2020 WL 1486042, at

*9 (D.N.J. March 27, 2020); Schneider v. Saul, Civ. No. 18-193, 2020 WL 774036, at *4

(M.D. Pa. Feb. 18, 2020); Tursky v. Colvin, Civ. No. 14-3241, 2015 WL 4064707, at
*17-19 (D.N.J. July 2, 2015).

The Third Circuit has instructed that an ALJ's step-three finding must be read as
part of the ALJ's decision as a whole and that there is no requirement that an "ALJ use
particular language or adhere to a particular format in conducting his analysis," Jones,
364 F.3d at 504, and therefore support for the ALJ's Listing determination could
conceivably be gleaned from elsewhere in the opinion.  However, that is not the case
here.  The ALJ's narrative summary of the administrative record is less than three full
pages in length, see id. at 530-33, and is primarily devoted to records from the first,
closed period of alleged disability, with only scant reference to records from the second
period.  This is problematic because Plaintiff's condition appeared to worsen in the
interim while she worked, resulting in significantly more orthopedic treatment during the
second period.  Indeed, even accounting for some duplication, medical records related to
Plaintiff's second period of alleged disability span many hundreds of pages.  See id. at
822-1654.  Therefore, the ALJ's failure to reference the later records in her discussion of
the Listings, and her extremely sparse reference to them even in her narrative summary,
cannot be sustained.

Second, in specific reference to Listing 1.04C, the ALJ's statement that Plaintiff's
lumbar impairment does not result in pseudoclaudication is contradicted by the medical
evidence.  Although the ALJ does not mention pseudoclaudication anywhere other than
as a requirement in the Listing, Plaintiff's orthopedic physicians repeatedly diagnosed

neurogenic claudication[28] during her course of treatment, which included repeated diagnostic testing and regular physical examinations.  Id. at 1346 (03/05/18), 1344 (03/19/18), 1341 (04/06/18), 1328 (07/09/18), 1325 (08/15/18).  Additionally, it is beyond question that Plaintiff's pain, including her low back pain, is "chronic," nor is it disputed that the combination of her impairments has made it increasingly difficult for her to ambulate effectively, resulting in her use of a cane.  The ALJ did not reference this evidence or explain why she considered it irrelevant to her Listings analysis.

Third, in specific reference to Listing 1.02, the ALJ's conclusory statement that Plaintiff's degenerative joint disease of the left hip does not meet the Listing is also problematic.  As the medical summary demonstrates, Plaintiff's gradually deteriorating hip condition worsened during and after her return to work.  For example, Dr. Garino found on May 16, 2018, that Plaintiff exhibited abnormal pattern gait, tenderness over the groin and greater trochanter area, and limited range of motion due to pain, with x-rays showing moderate to severe joint space narrowing and osteophytes, all of which resulted in a diagnosis of traumatic arthritis of the left hip, discussion of a possible total hip replacement, and continued narcotic pain medication.  Id. at 1334.  Dr. Ruggiero similarly and repeatedly discussed a total hip replacement with Plaintiff, and by July 24, 2019, the replacement procedure needed only a dental clearance to proceed.  Id. at 1623.

In sum, the ALJ's consideration of Listings 1.02 and 1.04 is inadequate and I will remand this matter for proper consideration of these Listings in the context of the second,

---

[28]As previously noted, supra at n.23, pseudoclaudication and neurogenic claudication are synonyms.

open period of alleged disability.  Moreover, to the extent it is unclear whether and to

what extent Plaintiff's pain and ambulatory difficulties are attributable to her lumbar

impairment as opposed to her left hip impairment, the ALJ shall obtain either clarification

from Plaintiff's treating orthopedists or updated expert opinion regarding the cause,

extent and limiting effects of these impairments.[29]

b.     Mental Listings

Listings 12.04 and 12.06 provide multiple ways to demonstrate the existence of a

severe mental impairment based on satisfying certain criteria.  Both Listings have "A"

"B" and "C Criteria."  For impairments under 12.04 (depressive, bipolar and related

disorders), the severity requirements are "satisfied by A and B, or A and C."  20 C.F.R.

Part 404, Subpart P, Appendix 1, ¶ 12.04.  Similarly, Listing 12.06 (anxiety and

obsessive-compulsive disorders) is "satisfied by A and B, or A and C."  Id. ¶ 12.06.  The

"B Criteria" for Listings 12.04 and 12.06 are the same, and require a showing that the

applicant has "[e]xtreme limitation of one, or marked limitation of two, of the following

areas of mental functioning: (1) [u]nderstand, remember, or apply information,

(2) [i]nteract with others, (3) [c]oncentrate, persist, or maintain pace, and (4) [a]dapt or

manage oneself."  Id. ¶¶ 12.04(B), 12.06(B) (cross-citations omitted). The "C Criteria"

---

[29]I reject Plaintiff's argument that she is entitled to an award of benefits.  Doc. 14 at 20-22.  As previously explained, the first remand concerned issues arising from the first closed period of alleged disability, whereas the present remand is limited to the second, ongoing period of alleged disability.  The record does not contain expert opinion evidence from the second period, including as to whether Plaintiff meets or equals a Listing.  Because this will be the first remand related to the open period of alleged disability, Plaintiff's arguments that the case is more than seven and a half years old, and that the record is "fully developed," id. at 21, do not apply.

for both Listings require the mental disorder to be "serious and persistent," meaning a

medically documented existence of the disorder for at least two years and evidence of

both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly

structured setting(s) that is ongoing and that diminishes the symptoms and signs of your

mental disorder *and* (2) [m]arginal adjustment, that is, you have minimal capacity to

adapt to changes in your environment or to demands that are not already part of your

daily life."  Id. ¶¶ 12.04(C), 12.06(C) (emphasis in original) (cross-citations omitted).

The ALJ considered the mental health Listings as follows:

> The severity of [Plaintiff's] mental impairments, considered
> singly and in combination, do not meet or medically equal the
> criteria of listings 12.04 and 12.06.  In making this finding,
> the undersigned has considered whether the "paragraph B"
> criteria are satisfied.  To satisfy the "paragraph B" criteria,
> the mental impairments must result in at least one extreme or
> two marked limitations in a broad area of functioning which
> are: understanding, remembering, or applying information;
> interacting with others; concentrating, persisting, or
> maintaining pace; or adapting or managing themselves.  A
> marked limitation means functioning in this area
> independently, appropriately, effectively, and on a sustained
> basis is seriously limited.  An extreme limitation is the
> inability to function independently, appropriately or
> effectively, and on a sustained basis.

> In understanding, remembering or applying information,
> [Plaintiff] has a moderate limitation.  At the February 2013
> consultative exam, [Plaintiff] alleged that she forgot
> appointments and where she placed things.  [Plaintiff's]
> immediate memory was intact; however, her recall memory
> was moderately impaired as she was able to only recall three
> objects after a five to seven minute delay.  During a mental
> status exam performed in October 2013, [Plaintiff] was fully
> oriented with fluent speech, coherent thought processes, intact
> memory, intact higher cognitive functions, and ability to
> understand proverbs.

In interacting with others, [Plaintiff] has a moderate limitation. At the February 2013 consultative exam, [Plaintiff] alleged that she was socially isolated and avoidant. [Plaintiff] appeared hyper focused on being "hairy." [Plaintiff] reported that she does not trust people and does not have friends. [Plaintiff's] treatment notes generally indicated that she is cooperative with neutral mood and appropriate affect.

With regard to concentrating, persisting, or maintaining pace, [Plaintiff] has a moderate limitation. At the February 2013 consultative exam, [Plaintiff] had poor performance on serial sevens; however, she was able to accurately perform them at a later primary care visit. The consultative examiner noted that [Plaintiff's] attention was at least mildly impaired. [Plaintiff] reported that she could pay attention for thirty minutes and needed spoken instructions repeated.

As for adapting or managing oneself, [Plaintiff] has experienced a moderate limitation. [Plaintiff] alleged that she did not handle stress well and could not stay on tasks when there were changes in her routine. [Plaintiff] also reported worrying about everything. [Plaintiff] was able to shop in stores and manage her household, including caring for two children and doing household cleaning, but prepared meals with the assistance of her daughter.

Because [Plaintiff's] mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. As to listing 12.04(C) and 12.06(C), the record does not establish a serious and persistent mental disorder lasting at least two years with evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (2) marginal adjustment, that is, the individual has minimal capacity to adapt to changes in the environment or to demands that are not already part of the individual's daily life.

Tr. at 528-29 (exhibit citations omitted).

Plaintiff argues that the ALJ's determination regarding the mental health Listings is flawed. I disagree. As an initial matter, unlike Plaintiff's physical impairments, evidence of Plaintiff's mental health impairments comes almost entirely from the first, closed period of alleged disability, and therefore both the ALJ's discussion and Plaintiff's argument is premised on evidence from the earlier period. I previously found that the ALJ's decision is supported by substantial evidence as to the earlier period.

Additionally, the record supports the ALJ's decision as to the open period of alleged disability beginning in July 2017. Since that time, Plaintiff attended only one therapy session, on May 2, 2018, id. at 1609-12, explaining at the September 12, 2018 hearing that it "felt like a waste of time." Id. Although her treating physicians consistently diagnosed her with anxiety and depression during the second alleged disability period, for which they consistently prescribed Xanax and Lexapro, these are the same diagnoses and prescriptions that Plaintiff received during the first, closed period of alleged disability, as well as during the interim period when she was capable of performing SGA. Furthermore, when asked at the September 12, 2018 hearing to describe specific things that were bothering her, she replied, "I'm just tired." Id. at 559.

Because neither the medical record nor Plaintiff's own statements support a greater degree of limitation that the ALJ found, I conclude that this aspect of the ALJ's decision is supported by substantial evidence.

        c.      Whether impairments, considered in combination, medically equal the Listings

Plaintiff also argues that the ALJ did not explain her finding that Plaintiff's impairments, in combination, do not medically equal the Listings.  Doc. 14 at 9-10; Doc. 18 at 4.  Defendant does not substantively respond to this argument, simply asserting that "Plaintiff has not established that her impairments individually or in combination satisfied the heightened requirements of any listed impairment."  Doc. 17 at 8.

As previously noted, at step three of the sequential evaluation, an individual may be found disabled based on meeting the criteria of a Listing, or equaling a Listing.  See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  In determining whether a claimant medically equals a Listing, an ALJ must consider all impairments in combination.  Segal v. Barnhart, 342 F.Supp.2d 338, 341 (E.D. Pa. 2004); see also 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3).

In reference to Plaintiff's obesity, the ALJ stated that, "considered singly or in combination with other impairments," her obesity did not meet or medically equal the criteria of any Listing.  Tr. at 528.  The ALJ also stated that "[t]he severity of Plaintiff's mental impairments, considered singly or in combination, do not meet or medically equal" the mental health Listings.  Id.  However, other than such boilerplate language in those places and at the beginning of the step three analysis, the ALJ did not provide any discussion whatsoever regarding the combined effects of her numerous severe and non-severe physical impairments, nor did the ALJ address whether these physical impairments, in combination with her severe mental impairments, medically equaled a Listing.  This alone requires remand.  See Burnett, 220 F.3d at 119-20 (conclusory statement that claimant did not meet or equal Listing is insufficient, ALJ required to

identify relevant Listing, discuss evidence, and explain conclusion).  This omission is particularly striking here because the ALJ found that Plaintiff had moderate restriction in each of the four domains of mental functioning, based solely on her mental impairments, and therefore her multiple severe and non-severe physical impairments, if meaningfully considered in combination with the mental impairments, may well have resulted in a finding of marked limitation sufficient to medically equal a Listing.

For the aforementioned reasons, I conclude that this aspect of the ALJ's opinion is not supported by substantial evidence.  Accordingly, upon remand the ALJ shall consider whether Plaintiff's severe and non-severe physical and mental impairments, in combination, meet or medically equal a Listing in the context of the second, ongoing period of alleged disability.

## 2.    The ALJ's RFC Assessment

Plaintiff also argues that the ALJ's opinion is not supported by substantial evidence because the ALJ failed to reasonably explain her assessment of Plaintiff's RFC. Doc. 14 at 10-19; Doc. 18 at 4-7.  Defendant counters that the ALJ's RFC determination is supported by substantial evidence.  Doc. 17 at 8-9.

The RFC assessment is the most a claimant can do despite her limitations.  20 C.F.R. §§ 404.1545(a)(3), 416.925(a)(3).  In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe.  Id. §§ 404.1545(a)(2), 416.925(a)(2).  However, the ALJ is not required to include every impairment a clamant alleges.  Rutherford, 399 F.3d at 554. Rather, the RFC "'must accurately portray' the claimant's impairments," meaning "those

that are medically established," which "in turn means . . . a claimant's *credibly established limitations*." Id. (emphasis in original) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984) and citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002); Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999)). "In making the [RFC] determination, the ALJ must consider all evidence before him." Burnett, 220 F.3d at 121.

The ALJ's RFC determination is insufficient. As previously noted, the ALJ provides one RFC for the entire period October 2012 to the present, encompassing both the first, closed period of alleged disability, and the second, ongoing period, even though the medical and other evidence discloses that Plaintiff's condition significantly worsened during the interim period when Plaintiff was gainfully employed. Indeed, the record does not contain an RFC assessment from any treating physician or consultative examiner during the second, ongoing period of alleged disability. This flaw is compounded by the ALJ's inadequate narrative summary of the medical evidence, which consists of less than three pages and mostly concerns records from the first closed period. In fact, the ALJ's opinion contains only four citations to exhibits related to the second, open period, even though the records for the second period comprise more than 800 pages of the administrative record. See tr. at 822-1654. Not surprisingly, therefore, significant portions of pertinent medical evidence from the second period are neither summarized nor discussed, making it impossible to determine whether the ALJ fully considered that evidence in formulating her RFC assessment.

Additionally, the ALJ's four citations to records from the second, ongoing period of alleged disability do not accurately reflect the nature or potential limiting effects of her

impairments.  Most glaringly, entire diagnoses are omitted from the ALJ's decision.  For example, although Plaintiff was repeatedly diagnosed during this period with lumbar stenosis with neurogenic claudication, see id. at 1346, 1341, 1328, 1325, the ALJ does not mention the diagnosis in her opinion, despite having acknowledged that it is "a serious condition" during the September 12, 2018 hearing.  Id. at 549.  Similarly, except for one reference to a December 2012 EMG showing "no evidence of . . . radiculopathy," id. at 531, the ALJ does not otherwise mention radiculopathy, even though the record is replete with diagnoses of lumbar and cervical radiculopathy throughout 2018 and 2019 by Plaintiff's POC orthopedists, Drs. Ruggiero and Balotti.  These diagnoses were based on repeated physical examinations and diagnostic studies, such as a March 8, 2018 cervical spine MRI that revealed "right foraminal zone disc herniation at C5-C6, causing moderate to marked stenosis of the right neural foramen with effacement of the existing right C6 nerve root" and "a prominent diffuse disc bulge at C3-C4," with "mild acquired canal stenosis and cord compression" at both C5-C6 and C3-C4.  Id. at 1405.  Notably, Plaintiff's condition continued to worsen during this period despite treatment consisting of pain medication, repeated injections, and physical therapy.  Finally, despite clear evidence of worsening and severe hip pain, including a recommended total hip replacement, the ALJ makes no mention of the proposed surgery.

For the aforementioned reasons, I conclude that the ALJ's RFC determination is not supported by substantial evidence.  Accordingly, I will remand this matter to the ALJ for proper consideration of Plaintiff's RFC, including updated expert opinion(s)

regarding the extent and limiting effects of Plaintiff's impairments, if deemed necessary, limited to the second period of alleged disability.

### 3.   Medical Opinion Evidence

Plaintiff argues that the ALJ improperly rejected the medical opinion evidence of examining psychologist Dr. Waid.  Doc. 14 at 19-20; Doc. 18 at 7.  Defendant counters that the ALJ's consideration of the medical opinion evidence is supported by substantial evidence.  Doc. 17 at 10-11.

The ALJ stated the following regarding Dr. Waid's assessment:

> Consultative examiner William Waid, Ph.D.[,] assessed moderate limits as to understanding, remembering, and carrying out short, simple instructions and extreme limits as to detailed instructions.  He found marked limits as to interacting appropriately with all others and responding appropriately to work pressures and changes in a routine work setting.  The cognitive limits seem too extreme.  [Plaintiff] had good fund of information and adequate stream of thought, was capable of abstract thinking, was not suicidal or psychotic, and was not shown to be poorly oriented.  She should be capable of managing short instructions.  As to limits in interacting with others, [Plaintiff] is generally cooperative with neutral/appropriate mood and appropriate affect and does not appear as anxious as she did at the consultative exam.  Additionally, she indicated that she got along okay with authority figures and was never fired or laid off from a job due to problems getting along with other people.  Therefore she should be able to interact with co-workers and supervisors occasionally.

Tr. at 532 (exhibit citations omitted).

Dr. Waid evaluated Plaintiff on February 6, 2013, and therefore the doctor's assessment is applicable only to the first, closed period of disability.  I previously found that the ALJ's unfavorable decision is supported by substantial evidence as to that closed

period, rendering this claim irrelevant.  Additionally, as previously discussed in the context of Plaintiff's consideration of the mental health Listings, Plaintiff's mental health treatment does not support a finding of greater limitations during the second, ongoing period of disability, as for example she attended one therapy session during this period and her psychotropic medications are unchanged from the interim period when she worked.

Although this claim is not relevant to the second period of alleged disability, Plaintiff's argument that the ALJ improperly rejected Dr. Waid's opinion on the basis of the ALJ's lay medical judgment, see Doc. 14 at 19, warrants comment.  It is true that the ALJ's language indicating that Plaintiff "should" be capable of managing short instructions, and "should" be able to interact with co-workers and supervisors occasionally, sounds like lay opinion.  However, the ALJ cites Dr. Trievel's treatment notes to support her statement that Plaintiff exhibited less anxiety than during the consultative exam, as well as Plaintiff's own statements that she gets along okay with authority figures and never lost a job due to problems getting along with other people.  Id. at 532.  That observation is consistent with Plaintiff's testimony at her second administrative hearing, in which she explained that she stopped performing the jobs she held during the interim period due to physical problems rather than difficulties with peers or supervisors, id. at 552-53, and that her mental health-related problems amounted to "not being suicidal – just tired."  Id. at 559.  Therefore, Plaintiff's argument is without merit.

4.      ALJ's Consideration of Plaintiff's Testimony

Plaintiff lastly argues that the ALJ rejected Plaintiff's testimony without

reasonable explanation.  Doc. 14 at 20; Doc. 18 at 8-9.  Defendant counters that the

ALJ's consideration of Plaintiff's testimony is supported by substantial evidence.  Doc.

17 at 11-12.

Social Security Regulations require a two-step evaluation of subjective symptoms:

(1) a determination as to whether there is objective evidence of a medically determinable

impairment that could reasonably be expected to produce the symptoms alleged; and

(2) an evaluation of the intensity and persistence of the pain or symptoms and the extent

to which it affects the individual's ability to work.  20 C.F.R. §§ 404.1529(b),

416.929(b).  Similarly, the ALJ is required to consider both the objective evidence of

record and Plaintiff's subjective testimony.  See S.S.R. 96-7p, 1996 WL 374186, "Policy

Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims:

Assessing the Credibility of an Individual's Statements."  Even when the medical record

does not confirm or support a claimant's subjective complaints, the ALJ is required to

give them serious consideration.  See Smith v. Califano, 637 F.2d 968, 972 (3d. Cir.

1981).  The ALJ is also required to explain why she rejects such complaints with

reference to the medical record.  See Hartranft v. Apfel, 181 F.3d 358, 361 (3d. Cir.

1999).

Here, the ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, but that her statements

concerning the intensity, persistence, and limiting effects of the symptoms are not

entirely consistent with the medical evidence and other evidence of record. <u>Tr.</u> at 530. Because I will remand this matter for proper consideration of the Listings and reevaluation of Plaintiff's RFC, I do not find it necessary to rule on this issue at this time. On remand, the ALJ should reconsider Plaintiff's complaints after reconsidering the evidence with respect to the Listings and the RFC determination.

## V.   <u>CONCLUSION</u>

The ALJ 's decision is supported by substantial evidence as to the first, closed period of alleged disability (October 18, 2012, through October 1, 2015), but not as to the second, open period of alleged disability (beginning July 9, 2017). As to the second period, the ALJ failed to properly evaluate whether Plaintiff met or medically equaled the Listings, and failed to reasonably explain her assessment of Plaintiff's RFC. Accordingly, I will remand this matter to the ALJ for (1) proper consideration of the Listings, including whether Plaintiff's severe and non-severe physical and mental impairments, in combination, met or medically equaled a Listing, (2) reconsideration of Plaintiff's RFC, including updated expert opinion(s) regarding the extent and limiting effects of Plaintiff's impairments, if deemed necessary, (3) reconsideration of Plaintiff's complaints in light of the new Listings and RFC determinations, and (4) additional vocational testimony, if necessary.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELLIE JEMISON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  20-0733 |
| Social Security | : | |

## **O R D E R**

AND NOW, this 10th day of December 2020, upon consideration of Plaintiff's

request for review (Doc. 14), the response (Doc.17), and Plaintiff's reply (Doc. 18), and

after careful consideration of the administrative record (Doc. 12), IT IS HEREBY

ORDERED that:

1.    Judgment is entered REVERSING the decision of the Commissioner of
Social Security for the purposes of this remand only and the relief sought
by Plaintiff is GRANTED to the extent that the matter is REMANDED for
further proceedings consistent with this adjudication; and

2.    The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.